at all. Argument not to exceed 15 minutes per side. Please proceed. Thank you. Good morning, Your Honors. Brad Glazier appearing on behalf of the clerk that I would like to reserve three minutes for rebuttal. Your Honor, this is a case about a Central Michigan University professor and her husband. We assert that they were both retaliated against after her husband promoted a no-confidence vote against the university president and provost. The district court's decision was an order granting the defendant's motion for summary judgment. The basis of the district court's decision was, well, first of all, the district court acknowledged that the no-confidence vote was a protected activity for both Christopher Benison and for his wife Kathleen Benison. The district court acknowledged that both had suffered adverse actions. Dr. Benison was denied a promotional pay increase and was sued for the amount of compensation that she had received during a sabbatical. And Christopher Benison had a hold placed on his academic transcript. The court found that there was insufficient evidence of a causal connection between the adverse action and the protected conduct. And that's where we believe that the court erred. Was the court correct in terms of the decision that it was an adverse action to deny her a pay increase when she resigned before the I believe that that decision was correct, Your Honor. The decision was reached, first of all, at the department level. It was appealed pursuant to the relevant procedures. But the final decision wasn't made before she resigned. Because the final decision, as I understand it, had to be made at the very top level of the university and it was still in the appeal process when she resigned, is my understanding. You're correct. The provost makes the final decision and she had appealed the decision to the provost. The provost had not yet made a decision at the time that she resigned her employment. We learned through discovery that the provost deliberately delayed making a decision with a hope that she would resign, which we believe is evidence of an animus that the provost had. Why is that true? People faced with decisions all the time, perfectly innocent reasons, decide to delay making a decision if the issue goes away. I worked with a guy once who used to have about 100 telephone slips. He was the chief of staff of the attorney general. He had about 100 telephone slips in his pocket. I said, Jim, when are you going to ever return those phone calls? He said, Jeff, if I wait long enough, they'll all go away. It seems like just a natural thing to do. Why isn't that what was going on here? I just don't know why that would be animus. I think it's animus based on the email exchanges that took place. So this wasn't a decision where the judge, excuse me, where the provost just said that he was too busy to get to the matter. He first of all learned that Kathleen Benison had put her house on the market, which he said that's good news. And we have a professor here of esteemed credentials, and it's our contention that a reasonable and rational provost would want to retain a professor like that and not acknowledge or reference the fact that she might be leaving the university as good news. We also know that even though the university is saying that these decisions take a long time and the provost might not get to it for a while, before the decision was made by my client to resign her employment, there was already email traffic between the provost and the dean where they were trying to support the decision that had been made at the dean's level that she did not have sufficient service. And so we think that refutes the argument that this was just a matter where he didn't get a long round to it. Had she gotten the salary increase, she would have stayed? Yes. Yes, Your Honor, she would have stayed. She was... Remind me how much the salary increase was. $7,000. A year. A year. And it's very clear, Your Honor, from the case law that the denial of a promotion or promotional pay increase constitutes an adverse action. So we've diverted you from, you were going to go into causation, and that's where the district court said you failed. Correct, Your Honor. And our position is that the district court drew adverse inferences to the plaintiff, drew inferences in favor of the defendant with regard to a number of factual issues, one of which is that Dr. Benison was told flat out by Lee Orff, one of the department members, that he was going to teach her a lesson by denying her promotional pay increase for the very reason that her husband promoted the no-confidence vote. We also know that Dr. Benison was the first and only professor to be denied a promotional pay increase based upon service alone. We know that to deny the promotion, the department and the dean relied upon a lack of service to the department, which is the wrong standard. According to the collective bargaining agreement and the other information that was to guide that decision, it was service to the profession and service to the university. There were very limited requirements in terms of service to the department, such as participating in department meetings, volunteering for various committees, and the defendants appear to acknowledge that she met those specific requirements that were set forth in the policies and in the collective bargaining agreement. We also rely upon the provost's deliberate delay in reviewing the appeal, which we've talked about. We're relying upon the provost's good news email when he learned that Dr. Benison had put her house on the market. We're relying upon ex parte communications that took place between the dean and the provost regarding the appeal. So the way that this appeal process is supposed to work is that there is written paperwork, quite extensive written paperwork, that is submitted both at the department level and then at the appeal level. What is not supposed to happen is the dean contacting people in the department, forwarding that information to the provost without the knowledge of the professor. So you've been focusing on the pay increase issue. Yes. If we were not to believe that that was an adverse action because of the timing of her resignation, do you have causation evidence with respect to your other adverse actions? We do, Your Honor. So the other adverse actions that we reference, the first one is the decision to sue Dr. Benison in state court for the failure to repay the sums that she received during her sabbatical period. She was the first professor, the only professor, to be sued. She was the only professor to have not, excuse me, no professor in this situation that has taken a sabbatical has ever paid back the sabbatical pay. And we have a number of cases that we cite in our brief that we think are similar circumstances. One is surprisingly similar where the conclusion was made that because the professor worked hard during the sabbatical period, they weren't going to require her to repay the money that she had earned during the sabbatical period. But I think the more significant evidence is what they sued her for. So it wasn't simply the amount of salary that she received, which we think would have been within the terms of the language of the collective bargaining agreement and policy. They also sued her for the value of her benefits, but more surprisingly, they sued her for the value of the tuition remission that her husband received. So the way that this works, and it's fairly common in public universities, is that professors receive not only the right to take classes themselves, but their family members can take classes at the university without any obligation to pay for tuition. So that's what Christopher Benison was doing. He was taking classes and he didn't have to pay any tuition for it. That was while she was on sabbatical. While she was on sabbatical. And the collective bargaining agreement says that you are entitled to all of your regular benefits during a sabbatical period. Well, after Dr. Benison left and they decided to sue her, first of all, there was email exchange about let's just sue her for the amount of money we paid. And then there's some more email traffic that says, well, why don't we sue her for the amount of the value of her benefits, like her health insurance. So that was added on. And then when the lawsuit was filed, they also added on another $4,200 or $4,800, not for any money that she had received, which is the language in the collective bargaining agreement. They sued her for what they could have received had Christopher Benison been a regular student and paid tuition. Well, that just isn't supported by any language in any of the documents whatsoever. And we think it is directly relevant to the animus issue. And we also think it's an adverse action that was taken against Dr. Benison because she is the one that was sued. Give me your best case for the idea that a non-binding recommendation is an adverse action. What's the case if I read it, I'll go, yeah, okay. Fair enough. You know, I don't think that that issue has been addressed in either brief, Your Honor, and it's not something that I focused on. Okay, well, now's your time. I don't have a case for you. It seems counterintuitive to me that in a process with many steps along the way, you know, a non-binding recommendation not finally acted upon by the decision maker is itself the adverse action. I think that that would be a better argument if we didn't have the e-mail traffic that shows what would have happened. I mean, it's clear, Your Honor, that this. The e-mail traffic is not one way, right? I mean, you have her own e-mail. She's decided to move to Morgantown. Hooray. We plan to give a firm job offer next week. That's May 16th. Right, which is after the appeal was made to the provost. Two days after. Two days after. I would look at that and say she's basically abandoning this. Well, there is a body of law out there, Your Honor, that says that a party does not have to pursue something if it's going to be futile. And in this case, we know it would be futile based on the e-mail traffic that says, from the university standpoint, we're glad that she has put her house on the market and this is good news that she's resigning from her employment. That argues too much. I mean, she did appeal it. She didn't think it was futile. So, I mean, her actions contradict that theory. Well, to that extent, Your Honor, we would rely upon the other evidence and the other aspects of retaliation that took place in this case. Is there a qualified immunity question? If we were to find that you had established adverse action and causation, would there still be a qualified immunity question? And vis-à-vis, I'm thinking of the sabbatical reimbursement issue. Because the university is entitled, arguably, under the CBA to recoup the cost of the sabbatical if someone doesn't return to the university. They're entitled to recoup the salary and compensation. Right. So your claim is that they treated her differently in retaliation for her and her husband's protected conduct. Yeah. Your Honor, I don't believe that there's any issue with regard to qualified immunity because if they did, in fact, retaliate against her in some fashion because of her husband's no-confidence vote, that's a clearly established constitutional violation. So even if they could have tried to recoup the salary absent any protected conduct from a regular person who hasn't done any protected conduct, they can recoup the salary if they don't come back. Yes. So what case would say that there's no qualified immunity for an official who decides to file the suit that they could file anyway? Well, I think the qualified immunity issue tests whether or not there has been a violation of a clear constitutional right, correct? So, yes. So is it clearly established that you cannot bring a suit that you would otherwise legally be able to bring as a state official to recoup the salary if you have a bad motive? I think that the issue is whether or not they had a bad motive and took some sort of retaliatory action. I don't think you can parse. I think that's the problem that the district court judge got into and the defendant's position that you can parse all this out and try to avoid the fact that there was this no-confidence vote, there was an action that was taken very soon thereafter to deny the promotional pay increase, there was this e-mail traffic indicating that they thought that that was a great idea that Dr. Benison was going to leave even though she was a very qualified professor. We have all of this other evidence. If there's a motive, if they retaliated against her because of the no-confidence vote, that's clearly illegal by well-established case law. It's a causation problem, isn't it? I think the causation issue is different. The CBA lets you do something. You can't say you're not allowed to do it because there's a suspicion that you had a bad motive. I mean, the problem is the drafting of the CBA. That's the cause. So what I'm wondering is, is there a case that says you can sue, you, Ms. Benison, can sue even though somebody who didn't engage in protected conduct could be sued by the university to recoup the salary benefit? In other words, saying that people in this protected conduct area, people in the university's shoes, are limited in their use of the CBA. Obviously, this is a unique fact pattern, but I'm wondering if there are more generalized cases. I'm not aware of such case law, Your Honor. I think what the case law tends to look at is whether or not there was an adverse action taken and what was the motive for that adverse action. And the qualified immunity issue is basically put to the side. Yeah. The other thing I wanted to raise with regard to that is that's a new issue that wasn't raised in the district court. Qualified immunity? Right. That's being raised for the first time on appeal. Thank you very much. Thank you. Good morning, Your Honors. Ryan Kaufman on behalf of the appellees. If I could start just for a moment, Judge Moore, with your question that you left off on. We did point to some case law in our brief that suggests that an action for retaliation cannot be based on a lawsuit unless there's a retaliatory animus and the lawsuit is meritless, that there is merit to the lawsuit. That would say that state officials can retaliate so that even though normally they wouldn't sue professors to recoup the sabbatical pay if the professor doesn't return, because they dislike this professor because of her protected speech, they can retaliate against her. That's what you're saying the law says. There are cases that we cited that would say that both those elements, both retaliatory animus and a lack of a reasonable basis for a lawsuit, are required to base an adverse action on a lawsuit. And if you could give me the names of the cases. Certainly. Martinez v. Deaf Smith County Grain Processors, 583 F. Supp, 1200. It's a District of Texas case, and it was relying on a Supreme Court case of Bill Johnson's Restaurant, NLRB 461 U.S. 731. It's on pages 748 and 749, this 1983 case. And then there's also, and this appears on page 63 of our brief, if you just want to see a couple more, because we did cite two unpublished cases that kind of go along with that, but I won't give you those. But getting back then to how that would tie into governmental immunity, it would very much, at least with that decision of whether there's a clearly established right. They say you didn't raise this below. We did raise it below, Your Honor. It's in the brief for summary judgment brief. I could find you the pages, but if you look at the brief, we do make a qualified immunity argument in the court below. And even if we hadn't, this court could certainly affirm for reasons not, affirm the right decision on different grounds. But we did make that argument below. The basic problem, though, that I'm sure you see, is that an evil-minded university here could be, in fact, totally retaliating against a professor for her protected speech if they have a provision in the CBA that says we can recoup your sabbatical pay if you don't return, and yet they hypothetically never have ever tried to recoup anybody else's sabbatical pay when they don't return, and there are obvious cases of that happening. Okay. And I understand. And I would start by saying that in this particular case, we don't have evil university professors. I was speaking hypothetically. And I understand. I understand where you're going. And I would say that the case that I just cited to you is a district court case from Texas. It's not binding precedent on this court, and if this court didn't want to establish that. Why is it persuasive? I'm portraying it in the opposite way to try to get you to help me on this, because the way I'm portraying it, you would think that people would want to say that someone such as if, hypothetically, it is this evil motive and the university has never acted in that way before. I think that the problem, though, would be that if the lawsuit is meritorious, then there would be some kind of intervening cause that would break any kind of causation that you were trying to connect between the protected action and this adverse action, because there's this intervening action that would have led to the meritorious lawsuit. In my hypo, there is no reason, because the university never, ever has tried to recoup sabbatical pay, even though, hypothetically, there were 25 professors who didn't return after their sabbaticals. And all of a sudden they decide in this one case where someone hypothetically has spoken out and said the president of the university is a jerk. And it's obvious that the reason why they're trying to recoup her sabbatical pay, in my hypo, is because of her speech, saying the president of the university is a jerk. If there were such a case, I suppose, that there were direct evidence that the only motivation of the lawsuit was this retaliatory animus, maybe we would have... But the CBA says they can do it. But the CBA does say... So it's legal for them to be recouping her sabbatical under the CBA. They are taking actions to recover, and in this case it was to recover literally tuition dollars that students had paid, governmental money that the university receives from the state. This is very... Universities have small budgets. Every dollar counts. And they have brought... This was the first action that they've brought, in this case, that CBA has brought against a professor, but this is an extraordinarily rare event where a professor would not return after a sabbatical and refuse to pay the compensation. This only happened... We can only find five occasions in the last 10 or 15 years. Was there evidence that, in the record, that other professors actually paid back their sabbatical money? The two professors who had left while Provost Shapiro was provost both qualified for the exception under the medical exception. There's a specific exception in the Faculty Association Agreement. Then what happened? You said there were five total? Yes. So those are two with Professor Shapiro. Dr. Benenson was one. Another one before Provost Shapiro was a professor who returned to his homeland in South Korea, and CMU wrote him and said, you know, you've breached your sabbatical agreement. You owe us $60,000. Please pay that amount back. He said, no, thank you. I'm in South Korea. And an economic decision was made not to bring suit against that individual. Give me the quick summary. You said there were five? Okay, so that's four. And then the fifth one was before Provost Shapiro. It was not a decision made by him. And a professor was allowed to go to a different university. So I'm having a little trouble understanding you. I don't care about the provost. I don't care about Benenson. I want to know what happened in the last 10 to 15 years every time someone didn't return from sabbatical. Is there a single time they paid the money back? Not paid the money back, but the money was demanded from the professor who went to Korea. But they never got it back. They did not get it back. No, they didn't. So they asked for it one time. Maybe multiple times. I don't know how many times they asked for it back. I don't know how many times. From one person. They asked for it from only one person, right? Okay. And they didn't sue because that person was abroad. That's the idea? That's true, Your Honor. Somehow, somewhere, I got the idea that there was this professor who was discussed on page 533. They took out the name of the professor. But that they forgave that professor from paying back the sabbatical money, even though that professor was not actually sick? No, she did have health issues, the one. The professor's name that we redacted the name of. And that's why we redacted the name, to protect some of her health concerns that she shared. So there's no factual issue as to whether she was or wasn't sick? There was a basis to believe that she was sick and that the illness was at least in part of the reason that she could not return. And under the terms of the Faculty Association Agreement, waiver is required in that situation. It's not left to the discretion. But was there a factual issue on whether or not she was excused because of medical reasons? This? This other person. Was there a factual issue? In other words, this is summary judgment, right? Sure. So we take all facts in the light most favorable to your opponent. So if everybody agreed that that person, that other professor's sabbatical pay was excused from being returned because of medical reasons, then we would say that's a different case. And that would support you. But if your opponent has some evidence that this person didn't actually have... I'm sorry to cut you off. I understand your question now. And I didn't see anything that my opponent said that this lady did not have these medical issues. We supported the evidence that we had, some letters and some emails from her that documented some of the health concerns that she was having. And there was the decision by the previous provost that she'd satisfied the clause in the Faculty Association Agreement and that she would be excused in that case. What's your best case for the point that on the nine-binding recommendation that's not acted upon by the provost, that itself is not an adverse action? I think a case that comes pretty close is Crouse v. City of La Crosse, 246. Well, just tell me quickly what happened. So this was a case where there was basically a negative performance review that didn't impact the employee's, you know, her pay or her terms of employment. Remember the year of the case? Yeah, it's a Seventh Circuit case. I didn't write down the year. 246 F. 2nd. It's the 90s, I think. As soon as you say F. 2nd, I think you're in trouble because there's a case that came out of our court which was pretty tough on pretty broadly defining adverse action and basically saying anything that might deter a reasonable person from acting suffices.  a negative employment review would count. So I think the point here isn't so much... I don't see how evaluations help you. It seems to me it's the point that this is part of a process that was pretermitted by her, you know, choice to leave. But the first process was started by the department and they had a negative vote against Dr. Benenson and Dr. Benenson suggested that one of her co-faculty members made some kind of comment about it being due to the protected speech. But none of the defendants participated in that vote. None of them participated in the discussions of that vote or the process or anything. It had nothing to do with the vote. None of the defendants knew that this professor allegedly made this comment. Professor Benenson certainly didn't alert them to that fact. She gave, as part of her appeal, dozens of pages and never mentioned this fact. And even after learning about it, she allegedly heard this professor make this comment before the department vote, yet she sent dozens of emails to her colleagues saying that it was due to her disagreement with Shen Morgan, the department chair, regarding the leave assessment. So again, never mentioned it. But if it happened... I'm understanding you seem to be making an argument that even if the vote was binding, there still was no connection to these other disputes and problems. Not exactly. Is that the point you're making? There's no connection between what the defendants did and what the department vote was. And there's no connection between Dean Davidson's acceptance of the department's vote and his further recommendation to the provost that she not be awarded the raise and any protected speech. There's just no evidence of that in the record. Because Dean Davidson, his associate deans first met with Dr. Benenson's advocate, a colleague of hers from the biology department. They authored a recommendation that the dean not recommend her for the raise. So he had that, he had the department recommendation, and he made his own recommendation to the provost. And then again, she resigned or accepted the job at West Virginia a little more than 48 hours after submitting her application materials to the provost. The provost didn't make his actual decision until sometime in July, months, months later. Did he make an actual decision? It's to hers, it's to the other appeals that were pending that semester. So that was kind of his timeline. As far as Dean Davidson, he made five negative, five negative recommendations for other professors that semester. And one from Dr. Benenson's own department, Dr. Wykander. Well, Benenson knew that the various tiers were recommending against her getting a pay raise and that the decision was at the provost's level at the time that she accepts the job in West Virginia. So why wasn't she essentially constructively discharged? Because she took the job under the circumstances that she knew that she had been denied a pay raise in the key tiers at the top. And if we assume that Dean Davidson passing along the negative recommendation is adverse action, and let's assume that for a minute, that's a whole separate contention that this is also a constructive discharge. I mean, you can have something more minor, more broadly interpreted to be an adverse action, but does it rise to the level of constructive discharge, not getting a raise that the professor can apply for? Again, the following year, a $7,000 raise is constructive discharge. Does that make the conditions of employment so intolerable that a reasonable person couldn't work there any longer? I would suggest not that constructive discharge doesn't factor in this at all. Is there an adverse action? Whether there is or isn't, we've still got to get to the causation element, and that one's... Plaintiff has failed to establish that causation. We would still contend that there's not an adverse action by any of the defendants. And that's all I have, unless there's any further questions. Thank you. I'd like to first return to this issue about what happened to the other professors on sabbatical. And so this is addressed in my primary brief at page 22. But I indicate evidence in the record indicating that Professor Shapiro approved the waiver of any requirement to pay back a sabbatical because of a professor's long-distant marriage. And then he also did not pursue a professor who resigned to accept a position at another university to solve my family problem, quote-unquote. So I do believe that there are other cases out there that are similar in the sense that they didn't involve any sort of overriding medical issue. And then there's another example that I cite on my brief where I reference that a professor wasn't pursued because of all of the work that she had done for the university during her sabbatical. With regard to the other issue that we've been talking about, which is, does she have to pursue this appeal up through the level of the provost in order to make a claim? Although I haven't cited any cases on this in my brief, if it would benefit the Court, I would like to submit just a short supplemental brief that addresses this issue in a situation that I think is most analogous, which is in the context of a union requirement that a union member exhaust administrative remedies with their union before they file a Section 301 case in court. The courts have acknowledged that that exhaustion requirement is not necessary if it is going to be a futility. And I think those are the circumstances here. We certainly know that now in hindsight, but I also don't believe that there is any evidence in the record of the provost ever reversing a decision that's made by a dean with regard to one of these promotional pay increases or other issues. And the last thing that I want to leave you with is that in addition to the other retaliatory action that we've been talking about, there was a hold that was placed on Christopher Beneson's transcript. And what that means is that he is not allowed to continue to pursue the completion of his degree as a consequence of that hold being placed on the transcript. So they could have just said, you know, we're going after Dr. Beneson for the payment of this tuition in state court and ended it there. But instead they took this retaliatory action against Christopher Beneson himself. And that has continued through today. And he's now in West Virginia with Professor Beneson and cannot continue with his studies unless that hold on his transcript is removed. And there is nothing in the collective bargaining agreement that says that the university is entitled to take that sort of action. Thank you. Thank you both for the argument. The case will be submitted with the clerk.